MONTGOMERY AMATUZIO
CHASE BELL JONES, L.L.P.
Lori K. Bell, W.S.B. # 7-5898
4100 E. Mississippi Ave, 16th Floor
Denver, Colorado  80246
Telephone: 303-592-6600
Email: lbell@mac-legal.com
ATTORNEY FOR THE PLAINTIFF

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 FEB 11  PM 1:56

STEPHAN HARRIS. CLERK
CHEYENNE

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

Civil Action No.: 19-CV-32-S

NAUTILUS INSURANCE COMPANY, an Arizona corporation,

     Plaintiff,

v.

ASHBY CONSTRUCTION, INC., a Wyoming corporation,
TORI CHILSON, an individual,
JANAE MORTON, an individual,
THOMAS MONTOYA, an individual,
GALEN PATRICK, an individual, and
CRYSTAL BEAGLE, an individual,

     Defendants.

---

## COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

---

Plaintiff Nautilus Insurance Company ("Nautilus"), by and through counsel, Montgomery Amatuzio Chase Bell Jones LLP, by this Complaint pleads and alleges causes of action against the above named Defendants as follows:

### NATURE OF THE COMPLAINT

1.    In this action, Nautilus seeks a declaratory judgment that it has no coverage for, and thus owed no duty to defend or indemnify, Defendant Ashby Construction, Inc. ("Ashby"),

with regard to the claims asserted against it by Defendants Tori Chilson, Janae Morton, Thomas Montoya, Galen Patrick and Crystal Beagle (collectively, "Claimants"), arising out of the alleged faulty construction of residential homes located at 3239, 3240 and 3251 Sienna Drive, Casper, Wyoming (the "Properties"). Nautilus also seeks a declaratory judgment that it breached no obligations to Ashby under the Nautilus insurance policy or applicable law in its handling of the subject claims.

2.      Nautilus does not, by bringing this action, request the assistance or participation of any of the Defendants in this action. To the extent that the Defendants wish to participate in this action, such participation concerns the assertion or protection of their own rights and claims, if any, which rights and claims are adverse to Nautilus.

3.      Nautilus has named the Defendants as parties to this action because they are believed to possess actual or potential interests that may be implicated by the relief herein requested, to allow them an opportunity to participate in this action with respect to such interests to the extent they wish to do so, and to bind them to the adjudication of the matters herein raised.

4.      This Court has authority to declare the rights and obligations of the parties under the terms and provisions of the insurance policy at issue in this lawsuit, as provided by 28 U.S.C. §2201(a) and Rule 57 of the Federal Rules of Civil Procedure.

## JURISDICTION, VENUE AND PARTIES

5.      At all pertinent times, Plaintiff Nautilus was, and remains, an Arizona corporation in good standing with its principal place of business located at 7233 E. Butherus Dr., Scottsdale, Arizona 85260. Nautilus conducts business as a surplus lines general liability insurer in State of Wyoming.

6.     Upon best present information and belief, Defendant Ashby is a Wyoming corporation in good standing with its principal place of business located at 813 Cy Ave., Casper, Wyoming 82601.

7.     Upon best present information and belief, Defendant Tori Chilson is a natural person who resides at 3251 Sienna Drive, Casper, Wyoming 82604.

8.     Upon best present information and belief, Defendant Janae Morton is a natural person who resides at 3239 Sienna Drive, Casper, Wyoming 82604.

9.     Upon best present information and belief, Defendant Thomas Montoya is a natural person who resides at 3239 Sienna Drive, Casper, Wyoming 82604.

10.     Upon best present information and belief, Defendant Galen Patrick is a natural person who resides at 3240 Sienna Drive, Casper, Wyoming 82604.

11.     Upon best present information and belief, Defendant Crystal Beagle is a natural person who resides at 3240 Sienna Drive, Casper, Wyoming 82604.

12.     This Court has jurisdiction over this action under 28 U.S.C. §1332(a)(1) and (c)(1).   Plaintiff Nautilus and each of the Defendants are citizens of different states, and the amount in controversy by and between Nautilus and each Defendant exceeds $75,000, exclusive of interest and costs of suit.   Furthermore, Ashby seeks defense and indemnification from Nautilus with respect to these damages asserted by Claimants.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because Nautilus' alleged duties to defend and indemnify are situated in this Judicial District, which is also the situs of those damages claimed by Claimants against Ashby.   The performance claimed to be due to or for the benefit of Ashby from Nautilus occurred or would occur in this Judicial District in whole or in substantial part.

## FACTUAL BACKGROUND

14.     Janae Morton and Thomas Montoya entered into a contract with Ashby for the purchase and sale of the 3239 Sienna Drive address on or about November 12, 2015.   See **Exhibit A**, New Home Purchase Contract.

15.     Tori Chilson entered into contract with Ashby for the purchase and sale of the 3251 Sienna Drive address on or about December 30, 2015.   See **Exhibit B**, New Home Purchase Contract.

16.     Upon best present information and belief, Galen Patrick and Crystal Beagle entered into contract with Ashby for the purchase and sale of the 3240 Sienna Drive address.

17.     Upon present information and belief, troperties, located in the greater Mesa Del Sol subdivision in Casper, Wyoming, were erected by Ashby, in its role as the general contractor, between November 30, 2015 and July 31, 2016.  See Ex. A, p. 4; Ex. B, p. 3.

18.     According to the Construction Standards and Specifications contained in the parties' respective New Home Purchase Contracts, Ashby and/or its subcontractors were to perform the following work at the Properties – excavation and foundation, concrete flatwork, framing, exterior finish, roofing, windows, exterior doors, insulation, drywall, paint, interior trim, cabinets, countertops, ceramic wall tile, floor coverings/hard surfaces, appliances, plumbing, heating, electrical, hardware, and other miscellaneous work.  See Ex. A, pp. 24-28; Ex. B, pp. 21-25.

19.     On October 5, 2018, Mark W. Nelson, Esq., counsel for Claimants, issued a letter to Hampton K. O'Neill, Esq., counsel for Ashby, with respect to claims arising from the design, construction, marketing, sale and warranty of the homes owned by Morton, Montoya and Chilson.  See **Exhibit C**, Arbitration Demand Letter.

20.     Specifically, it is alleged that Ashby performed defective work on the Properties which "has and will continue to cause resultant property damage, including, but not limited to cracked and uneven floors, [c]racked doors and windows, cracked foundation walls, excessive and unsightly drywall cracks, cracked and deteriorating exterior cladding, water intrusion and resultant water damage." *Id.*, p. 2.

21.     Consequentially, Morton, Montoya and Chilson made a Demand for Arbitration pursuant to the terms of the parties' New Home Purchase Contracts and asserted claims against Ashby for negligence and breach of the implied warranty of habitability. *Id.*, p. 1; see also Ex. A, p. 13; Ex. B, p. 13.

22.     Claims for negligent misrepresentation/omission and fraud by commission and/or omission were also asserted against RAM Funding, LLC ("RAM"), for "its affirmative material misrepresentations and omissions relative to the marketing and sale of the Homes, including, but not limited to RAM's failure to disclose adverse material facts concerning the soils underlying the Homes, and the design and construction of the Homes relative to the recommendations of licensed geotechnical engineers." See Ex. C, pp. 1-2.

23.     The allegations of faulty and/or defective work are more particularly outlined in engineering reports completed by Higgins & Associates, Inc. ("Higgins"), dated October 24, 2018, who evaluated a total of 16 homes in the Mesa Del Sol subdivision, including the Properties. See **Exhibit D**, Higgins Reports.

24.     With respect to the home owned by Tori Chilson, Higgins identified the following construction defects/deficiencies:

1.     Uplift Connectors Not Installed
2.     Breach in Garage Fire Assembly
3.     Missing Basement Stair Fire Protector
4.     Improper Grading and Drainage

5.    Missing Anchor Bolts
6.    Inadequate Anchor Bolt/Sill Attachments
7.    Inadequate Depth of Perimeter Drain
8.    Sump Pump/Electrical Not Installed
9.    Over-spanned Joists
10.   Missing Basement Floor Assembly
11.   Voids Beneath Exterior Concrete Slab
12.   Missing Basement Vapor Retarder
13.   Improper Exterior Deck Attachment
14.   Platform-Framed Exterior Wall
15.   Improper Clearances at Exterior Siding
16.   Improper Clearances at Stone Veneer
17.   Missing Bottom Screed at Stone Veneer
18.   Missing Attic Access Hatch
19.   Roof Leak
20.   Basement Wall Insulation Not Installed
21.   Excessive Differential Foundation Movement
22.   Non-Compliant Exterior Stair Geometry
23.   Interior Wall Framing Supported by Non-Structural Slab at Garage and Guest Bedroom
24.   Missing Attic Ventilation
25.   Roof Trusses Not Properly Supported

*      *      *

*Id.*, pp. 22-78.

25.    With respect to home owned by Janae Morton and Thomas Montoya, Higgins

identified the following construction defects/deficiencies:

1.    Uplift Connectors Not Installed
2.    Missing Basement Stair Fire Protection
3.    Missing Landing at Garage Man Door
4.    Non-Compliant Interior Stair Geometry
5.    Improper Grading and Drainage
6.    Foundation Honeycombing
7.    Inadequate Anchor Bolt/Sill Attachments
8.    Inadequate Depth of Perimeter Drain
9.    Sump Pump/Electrical Not Installed
10.   Over-spanned Joists
11.   Missing Basement Floor Fire Assembly
12.   Missing Basement Vapor Retarder
13.   Improper Exterior Deck Attachment
14.   Platform-Framed Exterior Wall
15.   Improper Clearances at Exterior Siding

16.  Improper Clearances at Stone Veneer
17.  Missing Bottom Screed at Stone Veneer
18.  Missing Attic Ventilation
19.  Missing Attic Access Hatch
20.  Basement Wall Insulation Not Installed
21.  Excessive Differential Foundation Movement
22.  Non-Compliant Exterior Stair Geometry
23.  Interior Wall Framing Supported by Non-Structural Slab at Garage and Guest Bedroom
24.  Roof Trusses/North Exterior Wall Not Properly Supported

*       *       *

*Id.*, pp. 137-191.

26.     Higgins concludes, in relevant part, "that there are several defects in the design and construction of the [Properties]. Of primary concern is the past foundation movement, risk of future foundation movement, and numerous building code violations related to the life-safety aspects of the home. Several repairs are required to address the distress, defects, and deficiencies observed. [...] If foundation repairs are not completed in the near future, additional damages will likely occur and additional repairs will be necessary." *Id.*, pp. 80, 193.

27.     Morton, Montoya and Chilson subsequently retained Eastcliffe Consulting, LLC ("Eastcliffe") to prepare Remedial Construction Cost Estimates for the Properties in reliance upon the claimed defects and deficiencies identified the Higgins Reports. See **Exhibit E**, Eastcliffe Estimates. In relevant part, Eastcliffe alleges that the cost to repair the home owned by Janae Morton and Thomas Montoya totals $734,961, whereas the cost to repair the home owned by Tori Chilson totals $784,787. *Id.*, pp. 7, 15.

28.     With respect to the claimed damage to the 3240 Sienna Drive address, Galen Patrick and Crystal Beagle filed their Second Amended Complaint against Ashby and others on October 23, 2018. See **Exhibit F** hereto.

7

29.     In relevant part, Patrick and Beagle maintain that Ashby failed to construct the

3240 Sienna Drive address "in accordance with the minimum requirements of the relevant

building codes and failed to construct the homes in a good, workmanlike and habitable manner,"

as illustrated by the following defects:

(a)     Failure to install foundations below exterior and interior columns and
        walls;
(b)     Failure to install uplift connectors;
(c)     Failure to install basement stair fire protection;
(d)     Failure to install adequate basement headroom;
(e)     Improperly installing untreated wood in contact with concrete beam
        pockets;
(f)     Failure to install treated sill plates;
(g)     Improper termination of laundry room floor drains;
(h)     Failure to install window well ladders;
(i)     Failure to install window well drains;
(j)     Improper grading and drainage;
(k)     Foundation honeycombing;
(l)     Improper concrete design strength;
(m)     Improper anchor bolt/sill attachments;
(n)     Inadequate perimeter drain depth;
(o)     Improper post-to-LVL connections;
(p)     Over-spanned girder beams;
(q)     Missing basement floor fire assemblies;
(r)     Voids below concrete slabs;
(s)     Excessive flatwork movement;
(t)     Excessive differential foundation movement;
(u)     Missing basement vapor retarder;
(v)     Moisture intrusion into basements;
(w)     Improper clearances at exterior siding and stone veneer;
(x)     Missing weep screed at exterior cladding;
(y)     Missing attic ventilation;
(z)     Failure to install basement wall insulation; and
(aa)    Improper roof drainage and downspout extensions.

*       *       *

*Id.*, ¶ 41.

30.     It is further alleged that Ashby "developed, designed, constructed, marketed and

sold the lots and homes in [the Mesa Del Sol subdivision] without a drilled pier foundation

system or structural floors and failed to adequately prepare the soils on each lot to prevent swelling, subsidence and movement of supporting soils and the foreseeable, resultant damage to the homes." *Id.*, ¶ 40. As the alleged result thereof, the 3240 Sienna Drive address sustained damage, including "cracked and uneven floors, [c]racked doors and windows that cannot be opened or closed, cracked foundation walls, excessive and unsightly drywall cracks, water intrusion and resultant water damage." *Id.*, ¶ 42.

31.    A single claim for negligence is asserted by Patrick and Beagle against Ashby. *Id.*, ¶¶ 3.1-3.11.

## THE POLICIES AND ASHBY'S TENDER
## OF THE ARBITRATION DEMAND TO NAUTILUS

32.    Nautilus issued to Ashby policy no. NN590266, effective November 12, 2015 to November 12, 2016; policy no. NN749535, effective November 12, 2016 to November 12, 2017; and policy no. NN870758, effective November 12, 2017 to November 12, 2018 (the "Policies"). In relevant part, the Policies provide Commercial General Liability coverage with a per occurrence limit of $1MM, a general aggregate limit of $2MM and a products/completed operations aggregate limit of $2MM, subject to a $1,000 per claim bodily injury/property damage deductible. A true and correct copy of the Policies is **Exhibit G** hereto.

33.    Counsel for Ashby tendered the Arbitration Demand to Nautilus for defense and indemnity on October 29, 2018. See **Exhibit H**, Correspondence from Hampton K. O'Neill, Esq.

34.    By way of correspondence dated January 28, 2019, Nautilus agreed to defend Ashby from and against the Arbitration Demand subject to a full reservation of rights to deny coverage. See **Exhibit I**, Reservation of Rights letter.

35.     Based upon the above, there is an actual controversy existing between Nautilus and the Defendants regarding Nautilus' obligations under the Policies in connection with the Arbitration Demand and the Second Amended Complaint, which dispute is ripe for judicial determination.  Any preconditions to the assertion of this action by Nautilus have been met.

36.     Pursuant to 28 U.S.C. §§ 2201-2202 and Rule 57, Federal Rules of Civil Procedure, Nautilus seeks a judicial declaration of its rights and duties under the Policies.  This Court's declaration will confer certainty on the parties and serve the interests of justice.

37.     Nautilus properly and timely handled the subject claims, correctly determined the absence of coverage, and properly reserved the right to deny coverage and a defense to Ashby. For the reasons outlined in this Complaint for Declaratory Judgment and Other Relief, by operation of the terms, provisions and exclusions in the Policies, there is no coverage or potential coverage for Ashby in regard to the Arbitration Demand and the Second Amended Complaint.

38.     All Defendants are proper parties to this action, and are properly bound by all determinations rendered in this action.

39.     Nautilus asserts herein only its presently known claims, and therefore respectfully reserves the right to amend its Complaint for Declaratory Judgment and Other Relief to add, delete, or modify its claims as may be warranted in the future as more information is disclosed or obtained through discovery or otherwise.

40.     Nautilus does not waive any terms, conditions, provisions or exclusions contained in the Policies that may apply to preclude coverage for those losses alleged in connection with the Arbitration Demand and the Second Amended Complaint.

**COUNT I – DECLARATORY JUDGMENT – THE INSURING AGREEMENT TO COVERAGE A HAS NOT BEEN TRIGGERED BY WAY OF THE ALLEGATIONS CONTAINED IN THE ARBITRATION DEMAND AND THE SECOND AMENDED COMPLAINT**

41.    Nautilus incorporates by reference the allegations set forth in the previous paragraphs.

42.    The Commercial General Liability coverage part contained in the Policies includes Coverage A – Bodily Injury and Property Damage Liability[1] which provides, in pertinent part, as follows:

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.    Insuring Agreement**

a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. […]

\*        \*        \*

b.    This insurance applies to "bodily injury" and "property damage" only if:

(1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"

(2)    The "bodily injury" or "property damage" occurs during the policy period; and

(3)    Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in

---

[1]  The Policies contain Form CG 0001 (12/04) for the November 12, 2015 to November 12, 2017 policy periods. The Policies contain Form CG 0001 (04/13) for the November 12, 2017 to November 12, 2018 policy period. Because the forms are substantially similar in their relevant parts, Form CG 0001 (12/04) is cited herein.

whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

\*       \*       \*

See Ex. G, p. 10.

43.     As is relevant here, the above identified terms are defined in the Policies as follows:

### SECTION V - DEFINITIONS

3.     "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

\*       \*       \*

13.     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\*       \*       \*

17.     "Property damage" means:

a.     Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.     Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

\*       \*       \*

*Id.*, pp. 21, 23-24.

44.     In order for coverage to be triggered in the first instance, the factual allegations in the Arbitration Demand and the Second Amended Complaint must state an "occurrence" potentially resulting in "property damage"[2] during the Nautilus policy periods.

45.     Here, Claimants seek damages due to Ashby's defective and/or incomplete construction of the Properties "which has and will continue to cause resultant property damage, including, but not limited to cracked and uneven floors, [c]racked doors and windows, cracked foundation walls, excessive and unsightly drywall cracks, cracked and deteriorating exterior cladding, water intrusion and resultant water damage." See Ex. C, p. 2; see also Ex. F, ¶ 42 (identifying the same or similar damage to the Patrick/Beagle home).

46.     As further alleged by Higgins, "there are several defects in the design and construction of the [Properties].  Of primary concern is the past foundation movement, risk of future foundation movement, and numerous building code violations related to the life-safety aspects of the home.  Several repairs are required to address the distress, defects, and deficiencies observed.  [...]  If foundation repairs are not completed in the near future, additional damages will likely occur and additional repairs will be necessary." See Ex. D, pp. 80, 193; see also Ex. F, ¶ 40 (alleging "foreseeable, resultant" damage to the Properties as the result of Ashby's failure to "adequately prepare the soils on each lot to prevent swelling, subsidence and movement," in addition to various claims of defective/deficient work and building code violations at ¶ 41).

47.     These allegations do not present a claim for "property damage," as that term is defined above, as Claimants seek to recuperate economic losses arising from Ashby's alleged breach of the New Home Purchase Contracts and failure to build the home in a workmanlike manner.  Materially, there are no allegations of consequential damage to the Properties caused by

---

[2] Neither the Arbitration Demand nor the Second Amended Complaint presents a claim for "bodily injury."

or arising out of Ashby's work, whose scope, according to Claimants, included all phases of construction.

48.     Additionally, allegations of defective construction under a construction contract do not result from an "occurrence" because the Policies do not cover breaches of contract or extend coverage for the natural, foreseeable results of faulty construction.  The decision how to build something, albeit incorrectly, is not an "accident."

49.     Therefore, the insuring agreement contained in Coverage A has not been triggered in the first instance, as there are no allegations of "property damage" caused by an "occurrence" during the Nautilus policy periods arising out of Ashby's work on the Properties.

50.     Accordingly, Nautilus seeks a declaration pursuant to F.R.C.P. 57 that it has no duty to defend or indemnify Ashby with respect to the Arbitration Demand and the Second Amended Complaint because the insuring agreement to Coverage A had not been triggered, and that Nautilus has no coverage for the claims and damages asserted against Ashby by the other defendants herein.

## COUNT II – DECLARATORY JUDGMENT – ONE OR MORE EXCLUSIONS APPLY TO PRECLUDE COVERAGE UNDER THE POLICIES

51.     Nautilus incorporates by reference all allegations set forth in the previous paragraphs.

52.     Even if the insuring agreement to Coverage A is triggered by way of the allegations contained in the Arbitration Demand and the Second Amended Complaint, which Nautilus expressly denies, one or more exclusions contained in the Policies apply to wholly preclude coverage to Ashby for these losses.

53.     The Policies are subject to what are commonly referred to as the Faulty Workmanship/Business Risk Exclusions, which provide, in pertinent part, as follows:

**2.    Exclusions**

This insurance does not apply to:

*        *        *

**j.    Damage To Property**

"Property damage" to:

*        *        *

**(5)**    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)**    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

*        *        *

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

*        *        *

**l.    Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

*        *        *

See Ex. G, pp. 13-14.

54.    Relevant terms in the above exclusions are defined as follows:

**16.**    "Products-completed operations hazard"

**a.**    Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

15

    **(1)**    Products that are still in your physical possession; or

    **(2)**    Work that has not yet been completed or abandoned.  However, "your work" will be deemed completed at the earliest of the following times:

        **(a)**    When all of the work called for in your contract has been completed.

        **(b)**    When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

        **(c)**    When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

*    *    *

**22.**    "Your work":

**a.**    Means:

    **(1)**    Work or operations performed by you or on your behalf; and

    **(2)**    Materials, parts or equipment furnished in connection with such work or operations.

**b.**    Includes:

    **(1)**    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

    **(2)**    The providing of or failure to provide warnings or instructions.

*    *    *

*Id.*, pp. 23-24.

    55.    Exclusions j(5) and j(6) apply to preclude coverage for damages that occurred while the insured's work was ongoing.  By contrast, the Exclusion l precludes coverage for

16

damage to the insured's work taking place after the work is completed (i.e. damage falling within "products-completed operations hazard").

56.     In the present case, Claimants allege damage to very work Ashby performed, including the floors, doors, windows, foundation walls, drywall, and the exterior cladding.  See Ex. C, p. 2; Ex. F, ¶ 42.  Because the contract documents indicate that Ashby was the general contractor for the construction of the Properties, the entire project (including portions, if any, constructed by subcontractors) constitutes Ashby's "work."

57.     While the Arbitration Demand and the Second Amended Complaint do not identify the timing of the claimed damage to the Properties, the Higgins report at least suggests that some damage may have occurred after work was complete:

> As part of our investigation the homeowner provided us with the following background information and chronology of events:
>
> - Ms. Chilson stated they entered a contract to purchase the property before the home was built.
> - The home construction was complete by June of 2016 and her family moved in shortly afterward.
> - Ashby Construction, Inc. graded the lot and installed the front and side yard landscaping.  The builder installed the irrigation sprinkler system.
> - The builder did not install air conditioning as promised and charged Ms. Chilson $16,000 to finish the mother-in-law unit located behind the garage.
> - *A roof leak developed above the main front entry within a week of moving into the home.*  The builder attempted to repair the leak; however, the roof continues to leak during heavy precipitation.
> - *Drywall cracks began to develop during the first year after construction.*
> - Ms. Chilson stated she did not install the backyard landscaping due to concerns of foundation problems and the fear that additional irrigation water could further damage the home.
>
> *       *       *
>
> - Ms. Morton and Mr. Montoya stated they entered into a contract to purchase the property before the home was built.
> - The home required six months to build.  Construction was complete by June of 2016 and their family moved in shortly afterward.

17

- Ashby Construction, Inc. graded the lot and installed the front and side yard landscaping including the irrigation system.
- Ms. Morton and Mr. Montoya stated they did not install the backyard landscaping due to concerns of foundation problems and the fear that additional irrigation water could further damage the home.
- *The roof developed a leak that was repaired by the builder.*
- *The first interior drywall distress developed in late 2016.  Garage floor slab heave was observed shortly thereafter.*

*     *     *

See Ex. D, pp. 6, 122.

58.     Based upon the above, some of the claimed damage was observed after construction had been completed and thus, necessarily falls within the ambit of Exclusion l and the "products-completed operations hazard."

59.     However, because much of the damage is alleged to have been caused by foundation movement, it is certainly possible, if not probable, that the Properties sustained damage in some fashion while Ashby's construction operations were ongoing, thus triggering Exclusions j(5) and/or j(6).

60.     Exclusions j(5), j(6) and/or l apply to negate coverage for all damages claimed in the Arbitration Demand and the Second Amended Complaint, including the insured's subsequent repairs, if any, that it may have performed during the Nautilus policy periods.

61.     The Policies are also subject to various endorsements, including the Total Exclusion – Subsidence or Movement of Soil, Land, Bedrock or Earth Endorsement (the "Earth Movement Exclusion"), Form L236 (06/07), which provides the following:

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A.     The following exclusion is **added** to Paragraph **2. Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability,**

**Coverage B - Personal And Advertising Injury Liability** and **Coverage C - Medical Payments**:

This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury" or medical payments directly or indirectly arising out of, resulting from, contributed to, aggravated or concurrently caused by "subsidence or movement of soil, land, bedrock or earth", whether natural, manmade or otherwise.

We have no duty to defend any insured against any loss, claim, "suit", or other proceeding alleging damages arising out of or related to "bodily injury", "property damage", "personal and advertising injury" or medical payments to which this exclusion applies.

**B.**     For the purpose of this endorsement, the following is **added** to the **Definitions** section:

"Subsidence or movement of soil, land, bedrock or earth" includes, but is not limited to settling, bulging, shaking, sinking, slipping, shifting, eroding, rising, tilting, expanding, contracting, shrinking, instability, falling away, caving in, landslide, mudflow, flood, sinkhole, earthquake, volcano, or avalanche.

All other terms and conditions of this policy remain unchanged.

\*      \*      \*

See Ex. G, p. 40.

62.     The Earth Movement Exclusion bars coverage for "property damage" arising out of, resulting from, contributed to, aggravated or concurrently caused by "subsidence or movement of soil, land, bedrock or earth", whether natural, manmade or otherwise. In relevant part, "subsidence or movement" is defined to include settling, sinking, shifting, and/or contracting of soil, land, bedrock or earth.

63.     Much of the claimed damages to the Properties appears to have been caused by the "subsidence or movement" of soil within the meaning of the Earth Movement Exclusion.

57.     Specifically, the Higgins reports outline these damages as follows:

From a structural engineering perspective, the methods used to support the homes and the use of concrete slab-on-grade basement floors placed over highly variable and volatile subsurface soils is greatly concerning. It appears the builder and developer selected to utilize foundation construction types that included a high risk of future movement and did not inform the individual homeowners of the risks or the previous recommendations to construct the homes with deep foundations and structurally-supported basement floors. Based upon our review of the reports authored by the Hayes Consulting Company, it is our understanding the builder did not install drilled piers, did not perform a 10-foot over excavation, and did not install a layer of geofabric. Presently, we have been unable to locate evidence that a licensed professional engineer was hired to develop foundation plans to accommodate the soil/building loads, forces, conditions, and for the concrete used within this subdivision to have the sulfate resistance prescribed by the soil reports.

*     *     *

As shown in the summary tables included under Exhibit 3, we observed varying degrees of differential foundation movement at homes throughout the neighborhood.[3] The available geotechnical reports indicate the conclusion of those studies was that the subsurface solid could settle and/or heave upward over time.

*     *     *

See Ex. D, pp. 18, 60, 134, 175; see also Ex. F, ¶¶ 34-40 (discussing relevant observations and conclusions contained in geotechnical engineering reports prepared for the Mesa Del Sol subdivision and Ashby's alleged failure to "adequately prepare the soils on each lot to prevent swelling, subsidence and movement of supporting soils [...]").

64.     As the alleged result of excessive differential foundation movement, the Arbitration Demand and the Second Amended Complaint provide that the Properties have sustained damage in the form of "cracked and uneven floors, [c]racked doors and windows, cracked foundation walls, excessive and unsightly drywall cracks, cracked and deteriorating exterior cladding, water intrusion and resultant water damage." See Ex. C, p. 2; Ex. F, ¶ 42.

---

[3] According to Higgins, excessive movement was specifically observed at the Properties in July of 2018.

65.    It would appear, therefore, that this claimed damage, at least in part, arose out of and/or resulted from "subsidence or movement of soil, land, bedrock or earth," thus triggering the application of the Earth Movement Exclusion contained in the Policies.

66.    Accordingly, Nautilus seeks a declaration pursuant to F.R.C.P. 57 that it has no duty to defend or indemnify Ashby with respect to the Arbitration Demand and the Second Amended Complaint and that the damages claimed against Ashby by the other defendants herein are not covered by the Policies, because the claims asserted are wholly excluded by the Faulty Workmanship/Business Risk Exclusions and/or the Earth Movement Exclusion contained in the Policies.

WHEREFORE, Nautilus respectfully prays for a speedy hearing in accordance with Fed.R.Civ.P. Rule 57 and a declaratory judgment pursuant to the authority set forth in Rule 57 and 28 U.S.C. sections 2201 and 2202 adjudging and determining the rights and obligations of the parties under the Policies including, but not limited to, the following: (a) Nautilus did not and does not owe either a defense or indemnity to Ashby under the Policies in relation to the Arbitration Demand and the Second Amended Complaint; (b) Nautilus breached no obligations to Ashby under the Policies or applicable law in its handling of the subject claim and Nautilus owes nothing to Claimants; (c) the Nautilus policies do not cover any damages asserted against Ashby; (d) that Nautilus should be awarded its attorney's fees, costs and expenses as permitted by law; and (e) that Nautilus should be granted such other relief as the Court deems fair and proper.

Respectfully submitted February 8, 2019.

MONTGOMERY AMATUZIO CHASE
BELL JONES, LLP

By: s/
    Lori K. Bell, W.S.B. # 7-5898
    4100 E. Mississippi Ave, 16th Floor
    Denver, Colorado 80246
    T: (303) 592-6600  F: (303) 592-6666
    Email: lbell@mac-legal.com

ATTORNEYS FOR PLAINTIFF